# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1710

_____

|  |  |  |
|---|---|---|
| Ronald W. Jackson, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Arkansas. |
| Prudential Insurance Company of | * | |
| America, a foreign corporation | * | |
| doing business in Arkansas; | * | |
| Furniture Factory Outlet, Inc., | * | |
| Group Policy No. 79190, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: February 15, 2008
Filed:  June 23, 2008

_____

Before BYE, RILEY, and BENTON, Circuit Judges.

_____

RILEY, Circuit Judge.

Ronald Jackson (Jackson) brings this ERISA[1] action against Prudential Insurance Company (Prudential), alleging his claim for long term disability (LTD)

---

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq.

benefits was wrongly denied.  The district court[2] affirmed Prudential's claim denial, finding (1) Prudential had broad discretion to define the terms of the LTD insurance policy, and (2) Prudential's determination Jackson was not totally disabled under the policy's terms was reasonable.

Jackson appeals, asserting Prudential improperly redefined critical policy contractual terms when Prudential's disability determination was based on whether Jackson could perform sedentary work, not on whether Jackson could perform the material and substantial duties of his own occupation as Chief Financial Officer (CFO) for a furniture retailer.  We affirm.

## I.    BACKGROUND

Jackson worked at Furniture Factory Outlet, Inc. (FFO), as the CFO, from May 1993 until he terminated his employment as of April 15, 2003.  As an FFO employee, Jackson was covered under a Prudential group LTD policy. Under the Prudential policy's terms Jackson would qualify as disabled if he were unable to perform the "material and substantial duties of [his] occupation."

In November 2002, Dr. James Frederick (Dr. Frederick) diagnosed Jackson as suffering from hypertension; obstructive sleep apnea with unknown severity; shortness of breath and fatigue related to weight and restrictive lung disease; obesity; emphysema and coronary calcifications diagnosed by CAT scan; chronic disorder of the colon; and abdominal pain.  An exercise stress test showed an ejection fraction (EF) of 20%.[3]  In late November 2002, Jackson was evaluated by Dr. Jorge Hernandez

---

[2]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

[3]"[A]n ejection fraction [EF] is a percentage of the blood within the chamber that is pumped out with every heartbeat.  An EF of 55 to 75 percent is considered normal" because "even in a healthy heart, some blood always remains within this chamber after each heartbeat."  Yourtotalhealth, *available at*

who found the results of Jackson's November 6, 2002, pulmonary function test to be "remarkably abnormal." Afterwards, Jackson sought a consult referral to the Mayo Clinic for a second opinion.

Jackson was first examined at the Mayo Clinic on January 2, 2003, by Dr. Titus Evans (Dr. Evans), a cardiologist. Dr. Evans's notes indicate that on November 27, 2002, Jackson underwent a transesophageal echocardiogram which demonstrated an EF of 35% and a nuclear stress test conducted on November 7, 2002, which indicated an EF of 20%. Without having performed any tests on Jackson, Dr. Evans listed diagnoses of cardiomyopathy, probable obstructive sleep apnea, mild restrictive lung disease, weight problems, and moderate coronary calcification. Jackson informed Dr. Evans he had "noted a gradual decline in energy level over the past several years."

On January 3, 2003, Jackson underwent a transthoracic echocardiogram at the Mayo Clinic which indicated an EF of 25%. Three days later, a transesophageal echocardiogram demonstrated an EF of 30%. The physician conducting this test noted "[w]ith mild sedation [for the test] the patient developed episodes of apnea and upper airway obstruction," reporting these "[f]eatures are very suggestive of sleep apnea."

On January 6, 2003, Dr. John Shepard (Dr. Shepard), a Mayo Clinic sleep doctor, evaluated Jackson and concluded Jackson "will likely have quite severe obstructive sleep apnea." On January 7, 2003, Jackson was evaluated at Mayo's Heart Failure Clinic by Drs. Martha Grogan (Dr. Grogan) and Allison Pritchett (Dr. Pritchett). Dr. Pritchett reported "emphasiz[ing] to [Jackson] that I do believe that sleep apnea is playing a key role here. It will be important to treat [the sleep apnea] aggressively. I suspect we may see improvement in his blood pressure control and ventricular function with this." Dr. Grogan reported Jackson "has prominent fatigue which is almost certainly related to sleep apnea, and I suspect only a minor

_____

http://yourtotalhealth.ivillage.com/ejection-fraction.html (Last visited June 13, 2008). "A low [EF] could be a sign that the heart is weakened." Id.

contribution if any related to left ventricular dysfunction." Dr. Grogan concluded, "[t]here is a good chance for significant improvement including normalization of left ventricular function with treatment of sleep apnea."

On January 7, 2003, Dr. Evans reviewed the recent Mayo Clinic studies concluding Jackson's left ventricular dysfunction, low EF, and "fatigue related to sleep apnea," stand "a good chance of improvement with treatment of the sleep apnea, weight loss, etc." That evening Jackson underwent a sleep study, during which Jackson experienced 124 total "disordered breathing" episodes per hour during the initial diagnostic part of the study. Jackson was then provided with a nasal Continuous Positive Airway Pressure (CPAP) machine for the second part of the study. Jackson's "sleep disordered breathing and snoring were effectively eliminated" with use of the CPAP machine. Based on the sleep study results, Dr. Shepard concluded Jackson did have severe obstructive sleep apnea. Dr. Evans reported his expectation that "with CPAP [Jackson's] cardiac function, including [EF], and ventricular irritability, will all improve."

Jackson began use of the CPAP. On April 15, 2003, at a follow up examination, Dr. Frederick noted Jackson has used the CPAP "ever since [his visit to the Mayo Clinic] and noticed remarkable improvement in his sleep and daytime energy." Dr. Frederick also noted recent testing regarding Jackson's tachycardia demonstrated "considerable improvement since the primary study," and that a recent echocardiogram showed Jackson's "left ventricular [EF] improved from 20% to 45%" with Jackson's use of the CPAP machine.

At the April 15, 2003 examination, Jackson and Dr. Frederick discussed Jackson's job, with Dr. Frederick noting Jackson "has been under a great deal of stress lately . . . . [and has been] experiencing quite a bit of conflict with the owners of [FFO] . . . . [causing Jackson to become] more irritable and [to have] more frequent arguments with the owners and just today he was terminated . . . ." Jackson commented to Dr. Frederick that he did not feel he has "the energy to start a business

-4-

all over again or take on a job as he had before with [FFO] that entailed so much responsibility."

Jackson filed a disability claim with Prudential on April 26, 2003, describing his condition as "Heart Failure - left ventricular dysfunction - resulting in cardiomyopathy." Jackson asserted his condition interfered with his ability to work because it (1) caused an inability to concentrate, (2) caused memory problems, (3) made him unable to exert himself physically, and (4) left him feeling totally fatigued all the time. Jackson classified his job as "Sedentary" when asked to identify "What Job Category best describes your required job duties?" As a part of the claims process, Prudential was provided with Jackson's actual job description which listed eighteen separate functions or duties.[4] While these duties were primarily deskbound or sedentary, they required substantial cognitive and intellectual functioning.

Prudential's claim review focused on the physicality of Jackson's job which Jackson had categorized as sedentary. On July 25, 2003, claim manager Mary Ann DeSantis, RN, noted Jackson was at home and "is able to mow large lawn, and whether or not [he is using] a riding mower, this activity is greater than or equal to sitting at a desk," concluding Jackson's "sleep apnea has been corrected via CPAP . . . [and Jackson] could perform sedentary work." On July 28, 2003, Prudential determined Jackson was able to perform sedentary work, such as mowing his lawn,

---

[4]Jackson's job description listed eighteen responsibilities including responsibility for the preparation of monthly and annual financial statements; the preparation and filing of federal and state tax returns for the corporation, related entities, the owner and corporate officers; development and implementation of computer information systems for the home office and the individual stores; internal controls and the payroll, accounts receivable, sales, purchasing order and personnel departments and supervision of these employees; all risk management; all banking relationships; reviewing and writing all real estate leases; reviewing and supervising all legal matters; employee benefits; and maintaining the personal books and records for the owner and corporate officers, including all ranch and real estate activities.

had an EF of 40 to 48%,[5] and, according to Dr. Frederick, Jackson "moves around easily without any of the shortness of breath that was so noticeable prior to starting CPAP." Prudential determined Jackson was not disabled under the policy's terms.

Jackson appealed the claim denial asserting he lacked "the physical or cognitive abilities to perform his occupation." Jackson submitted a copy of his job description, which Prudential noted it already had, and upon which it classified his occupation as sedentary. Prudential consistently focused on Jackson's EF, which improved through the treatment of his severe obstructive sleep apnea, his use of CPAP, and Prudential's determination Jackson's occupation was "sedentary."

In a report dated April 22, 2004, Dr. Joyce Bachman (Dr. Bachman) conducted a thorough review of Jackson's claim concluding Jackson had worked with severe obstructive sleep apnea which, after being properly diagnosed, was successfully treated with CPAP. Dr. Bachman noted that since Jackson began CPAP treatment, Jackson had seen "considerable improvement" in his EF, now tested at 48%, his most recent blood pressure reading was "in the normal range . . . 128/74," and Jackson had "been exercising 40 minutes [per day] on the treadmill without difficulty o[r shortness of breath], palpitations or chest pain." Dr. Bachman concluded, "[t]here is no objective medical evidence of physical impairment or mental impairment that would preclude [Jackson] from working in his [own occupation] or as an accountant." In a letter dated May 12, 2004, based upon its review, Prudential reaffirmed its earlier decision to deny benefits.

In response to the assertion that objective medical evidence was lacking, Jackson sought testing by Dr. David Beare (Dr. Beare) to document Jackson's

---

[5]EF was "improved to 48% by muga scan [conducted on September 18, 2003] which is more accurate for his body size." Jackson's EF was referenced at 45% in a note dated September 15, 2003, while a note dated August 29, 2003, reported a phone call with Jackson where Jackson indicated his EF was "improved to 40%."

cognitive impairment. In October 2004, Jackson underwent testing and Dr. Beare authored his report. The testing was submitted to Prudential in December 2004 as a part of Jackson's timely request for reconsideration. Prudential discounted this evidence, asserting the testing occurred more than one year after the alleged onset date of April 2003 and could not be "back-extrapolated" more than one year. Therefore, in a letter dated February 8, 2005, Prudential reaffirmed its earlier conclusion that Jackson was not disabled. Prudential "concluded that Mr. Jackson's physical conditions would allow him to perform his own occupation on a full time basis," a decision "consistent with [Prudential's] previous and current evaluations." Prudential noted, "[t]his is the final level of appeal . . . . [and i]f you still disagree with the above decision, you may file a lawsuit under [ERISA]."

On December 14, 2005, Jackson filed this action in the United States District Court for the Western District of Arkansas alleging Prudential's decision to deny his claim was unreasonable. The district court affirmed Prudential's claim denial, finding the decision was supported by substantial evidence. This appeal followed.

## II.    DISCUSSION

The summary plan description grants Prudential, as "Claims Administrator," "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits," and notes "[t]he decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." "[W]e review the plan administrator's decision [to deny ERISA benefits] for an abuse of discretion" when "the benefit plan grants the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Groves v. Metro. Life Ins. Co., 438 F.3d 872, 874 (8th Cir. 2006) (citation and internal quotation marks omitted). Thus, the proper standard of review here is for abuse of discretion[6] because the summary plan description grants Prudential

_____

[6]The parties assert the proper standard of review is "arbitrary and capricious." "[R]eview for an 'abuse of discretion' or for being 'arbitrary and capricious' is a

discretionary authority both to determine benefit eligibility and to construe the terms of the group contract.

Under this standard of review, "[w]e reverse the plan administrator's decision only if it is arbitrary and capricious." Id. (internal quotation marks omitted). "When a plan administrator offers a reasonable explanation for its decision, supported by substantial evidence, it should not be disturbed." Ratliff v. Jefferson Pilot Fin. Ins. Co., 489 F.3d 343, 348 (8th Cir. 2007) (internal quotation marks omitted). Our court has stated, "[t]he discretionary decision of a plan administrator is not unreasonable merely because a different, reasonable interpretation could have been made." Id. (internal citation and quotation marks omitted).

The Mayo Clinic physicians diagnosed sleep apnea as Jackson's primary ailment and opined that effective treatment of his sleep apnea would result in improvements in Jackson's energy levels and EF. The Mayo Clinic physicians' diagnosis was correct because Jackson's tachycardia, EF, sleep and daytime energy all improved as a result of the CPAP treatment. In addition, Jackson's blood pressure was normal and he was successfully exercising on a treadmill for forty minutes per day without difficulty. Thus, it is reasonable to conclude Jackson was better able to perform the substantial and material duties of his occupation on his termination date than before CPAP treatment was initiated and before the alleged onset date of his disability. When Prudential's "decision is supported by . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . . [a] court may not substitute its own judgment for [Prudential's]." Rittenhouse v. UnitedHealth Group Long Term Disability Ins. Plan, 476 F.3d 626, 632 (8th Cir. 2007) (citation and internal quotation marks omitted).

---

distinction without a difference," because the terms are generally interchangeable. Schatz v. Mutual of Omaha Ins. Co., 220 F.3d 944, 946 n.4 (8th Cir. 2000).

"It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." Groves, 438 F.3d at 875 (alteration and internal quotation marks omitted). Prudential did just that, finding objective evidence of Jackson's cognitive impairment was lacking. The Mayo Clinic records do not mention any cognitive problems and described "no apparent learning barriers." Any mental or cognitive deficiencies reasonably were associated with sleep apnea and Jackson's resulting fatigue. Jackson later provided Dr. Beare's report in an attempt to provide objective evidence of cognitive impairment; however, Prudential decided not to consider this new evidence, because the evaluation was more than a year after the claimed onset date. Prudential's decision was not arbitrary and capricious. While consideration of Dr. Beare's report could lead another plan administrator to reach a different reasonable conclusion, Dr. Beare's report does not render Prudential's decision unreasonable where Prudential's decision is supported by substantial evidence.

Jackson complains Prudential arbitrarily limited its review of Jackson's job to a sedentary position. Dr. Frederick, FFO and Jackson (initially) all referred to Jackson's CFO duties as sedentary. Jackson's job description reflects sedentary duties. Jackson does not specify any particular job duty he could not perform except generally to argue the job stress and his cognitive impairment prevented him from performing his duties. Prudential possessed the job description, and contrary to Jackson's allegations, Prudential considered all Jackson's duties as CFO for FFO in formulating Prudential's coverage conclusion. That conclusion was not arbitrary and was not an abuse of Prudential's discretion as Claims Administrator.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court.

_____